UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLCELLS, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JACK ZHAI, et al.,<br><br>　　　　Defendants. | Case No. 16-cv-07323-EMC<br><br>**REDACTED/PUBLIC VERSION**<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Docket Nos. 11, 65 |

Plaintiff AllCells, LLC has filed suit against Defendants Cepheus Biosciences, Inc. and two if its employees, Jack Zhai and James Lee, asserting claims for, *inter alia*, trade secret misappropriation under both state and federal law. Mr. Zhai and Mr. Lee are former employees of AllCells and currently work for Cepheus (as CEO and CFO, respectively).

Currently pending before the Court is AllCells's motion for a preliminary injunction. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part AllCells's motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Jie "Jay" Tong founded the company that eventually became AllCells in 1998. *See* Tong Decl. ¶ 3. "AllCells is a biotechnology company dedicated to providing global researchers and biomanufacturing organizations with a dependable supply of biologically relevant, high quality primary cells that enable drug discovery, development, and manufacturing of cell therapies." Tong Decl. ¶ 3. "AllCells receives the raw blood or bone marrow directly from donors or from suppliers and then processes that biological material . . . to isolate the particular type of cells to sell to customers." Tong Decl. ¶ 3; *see also* Tong Decl. ¶ 44 (noting that AllCells processes tissue into cellular products and that AllCells "sells more than 300 different cellular products and

services").

AllCells hired Mr. Lee in October 2000. Mr. Lee worked in various capacities at AllCells, including, *e.g.*, as a lab manager, Associate Director of Productions, and Associate Director of Technical Support and Customer Projects. *See* Lee Depo. at 26-28,45; Tong Decl. ¶ 16; Lee Decl. ¶ 2. During his tenure at AllCells, Mr. Lee worked on, *inter alia*, developing standard operating procedures or protocols ("SOPs") for the company (*i.e.*, for isolating, storing, and shipping AllCells's biological products). *See* Lee Depo. at 21-22.

AllCells hired Mr. Zhai in 2010. Mr. Zhai was AllCells's Vice President of Marketing and Sales. *See* Tong Decl. ¶ 18; Zhai Decl. ¶ 2. Mr. Zhai's "job duties were not scientific or technical, and were primarily related to business development." Tong Decl. ¶ 18; *see also* Zhai Decl. ¶ 2 (testifying that he was "responsible for supervising the sales team, managing customer relationships, and high-level marketing").

At the time of hire, Mr. Lee and Mr. Zhai each signed an Employee Confidentiality Agreement and General Handbook Acknowledgment.[1] *See* Wong Decl. ¶ 3 & Exs. A-D (agreements and acknowledgments).

AllCells terminated Mr. Zhai's employment on December 18, 2015. The parties dispute the events that led to the termination. Soon after his termination, Mr. Zhai founded Cepheus. *See* Jacob Decl. ¶ 2 & Ex. A (Delaware state website) (reflecting that Cepheus was incorporated in Delaware on January 21, 2016).

In the meantime, Mr. Lee continued to work at AllCells. However, on April 5, 2016, Mr. Lee resigned from the company. *See* Tong Decl. ¶ 16. Before resigning from AllCells, Mr. Lee was in communication with Mr. Zhai, and e-mails between the two indicate that they intended on working together in a new company. *See, e.g.*, Lui Decl., Exs. E-F (e-mail exchange from May 2015); Lui Decl., Ex. G (e-mail exchange from December 2015).

According to Defendants, the "end-goal [of Cepheus] was . . . to serve a niche market within the immunotherapy space[,] [but], while developing the specialized immunotherapy-

---

[1] In addition, at the time of his termination, Mr. Zhai signed a severance agreement that contained a confidentiality provision. *See* Wong Decl. ¶ 8.

2

1 oriented business, to keep the lights on, Cepheus started by selling several 'commodity' items

2 (e.g., unaltered whole blood)." Zhai Decl. ¶ 8.

3       In or around September 2016, Mr. Tong of AllCells learned of Cepheus as, well as the

4 involvement of Mr. Zhai and Mr. Lee in the company. *See* Tong Decl. ¶ 22. After viewing the

5 Cepheus website, "AllCells immediately launched an investigation into [Mr.] Zhai's and [Mr.]

6 Lee's departures from AllCells." Tong Decl. ¶ 23.

7       As part of the investigation, AllCells hired a computer forensic analyst to evaluate the hard

8 drives associated with the laptops that had previously been used by Mr. Zhai and Mr. Lee. As

9 stated in the declaration from the analyst (Bruce Pixley), his preliminary focus was to see if

10 AllCells company data had been "exfiltrated" by an employee using external storage devices,

11 mobile devices, cloud storage, file transfer protocols, and/or email communication. Pixley Decl. ¶

12 5. The analyst uncovered the following.[2]

13       • **Mr. Zhai.** Mr. Zhai plugged in one external storage drive on December 12, 2015,

14         *i.e.*, several days before he was terminated.[3] *See* Pixley Decl. ¶ 8. He "created

15         more than 56,900 files and folders on this specific external drive." Pixley Decl. ¶

16         9. "Among the folders he created on the external drive . . . were: 'AllCells Outlook

17         Backup 12122015'; 'Product info'; 'CDAs'; and 'ERP system.' Based on the

---

[2] The Court acknowledges Defendants' objection to the Pixley declaration. More specifically, Defendants have asked the Court to strike the Pixley declaration on the basis that AllCells violated Mr. Lee's "privacy by using [his] old AllCells laptop to access, without Mr. Lee's authorization, his personal Gmail emails, including his communications with attorneys." Opp'n at 22 (arguing that, "at a minimum," AllCells violated the Stored Communications Act, *see* 18 U.S.C. §§ 2701-11, and the right to privacy protected by the California Constitution). Defendants have also asked for additional sanctions – *i.e.*, that "AllCells should be prevented from using any information derived from the violations." Opp'n at 23.

For purposes of the pending motion, the Court denies Defendants' request for relief. The record has not been sufficiently developed for the Court to rule on the merits as to whether there was, *e.g.*, a violation of any federal or state law. (In fact, it appears that Defendants intend to assert a counterclaim based on Mr. Pixley's actions.) Moreover, Defendants' request is overbroad. Finally, it appears that at least some of the emails were subsequently produced by Defendants during discovery. While this does not insulate AllCells from a claim of wrongdoing, it nevertheless allows the Court to consider the evidence. Moreover, it is not clear at this point that exclusion of evidence unlawfully obtained is an appropriate remedy.

[3] Mr. Zhai also plugged in a second external USB storage drive but this device appears to have been returned to AllCells. *See* Pixley Decl. ¶ 8.

3

findings it appears that Zhai made a backup of his entire Outlook data." Pixley Decl. ¶ 9. Among the files in the Outlook data were pricing documents and contracts/agreements. *See* Pixley Decl. ¶ 10. In his deposition, Mr. Zhai maintained that he downloaded his entire Outlook file only because he was not able to cherry pick which documents he wanted to copy. According to Mr. Zhai, he wanted to copy certain documents in order for an attorney to review them and give him advice. *See* Zhai Depo. at 86, 103, 111.

- **Mr. Lee.** Mr. Lee plugged in thirteen external storage drives on April 4, 2016, *i.e.*, the day before he voluntarily resigned. *See* Pixley Decl. ¶¶ 8, 14. At the time he plugged in the external drives, Mr. Lee created new folders on the devices and transferred dozens of documents. *See* Pixley Decl. ¶ 14. Documents in Mr. Lee's Outlook included agreements and a cryopreservation document. *See* Pixley Decl. ¶ 15. In his declaration, Mr. Lee testified that he had many personal files on his AllCells computer and that he "may have inadvertently copied some work-related files" when he transferred his personal files to flash drives. Lee Decl. ¶ 5.

According to AllCells, the AllCells trade secrets that were misappropriated by Mr. Zhai and Mr. Lee can largely be broken down into three major categories: (1) SOPs[4]; (2) information about AllCells's internal operations (in particular, a slide deck titled "2013 AllCells Q3 Business Meeting"); and (3) customer identities and customer-related information (in particular, information about customer needs/preferences, key contacts within a customer-company, pricing, and sales forecasts/projections).[5] AllCells takes the position that, without the misappropriation of its trade secrets, there was no way that Cepheus could have launched products for sale within only a few months. According to AllCells, it needed two years to launch its first products and then needed "at least five years to ramp up to its current quality levels." Tong Decl. ¶ 60.

---

[4] AllCells contends there is forensic evidence that Mr. Zhai and/or Mr. Lee downloaded over 100 SOPs.

[5] Although AllCells has claimed additional information as trade secrets (*e.g.*, product supply agreements and distributor agreements), its briefs have largely focused on the above three categories and, accordingly, the Court addresses these three categories only.

4

AllCells claims irreparable injury as a result of Defendants' actions because (1) Dr. Ian Gaudet, a person whom AllCells characterizes as a "key" customer, placed an order with Cepheus and (2) Amgen, another "key" customer, has informed AllCells that "Cepheus is eager for their business." Tong Decl. ¶ 59. AllCells "believe[s] that Amgen either has, or in the coming year will, move their business from AllCells to Cepheus" and that "this damage is just the tip of the iceberg." Tong Decl. ¶ 59. For example, Cepheus "could strongly compete with AllCells . . . because [it] know[s] exactly who AllCells sell[s] to without any research and [it] can convince the customer to switch products for dramatically cheaper without any of the sunken cost development." Tong Decl. ¶ 60.

## II. DISCUSSION

A. Legal Standard

> When bringing a motion for a preliminary injunction, a plaintiff must demonstrate: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. A preliminary injunction can also be issued if "a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," as well as satisfaction of the other *Winter* [*v. NRDC, Inc.*, 555 U.S. 7 (2008)] factors.

*Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016).

B. Likelihood of Success on the Merits/Serious Questions Going to the Merits

Although AllCells has raised multiple claims for relief, the driving force of the lawsuit is the trade secret misappropriation claim (brought under both federal and state law). This is especially true since the breach-of-contract claim applies to Mr. Zhai and Mr. Lee only, and not Cepheus. Accordingly, the Court focuses on the misappropriation claim at this juncture of the proceedings.

The Court finds that, for the most part, AllCells has sufficiently shown serious questions going to the merits on the misappropriation claim. The critical issue here is whether the alleged trade secrets were generally known or reasonably ascertainable, *see* 18 U.S.C. § 1839(e); Cal. Civ. Code § 3426.1(d), in which case the information could not be deemed a trade secret.

With respect to the AllCells SOPs, while they may include some public information, there is no evidence that the SOPs possessed by Defendants are simply wholesale copies of public information. There is also evidence suggesting that AllCells invested at least some time and research in deriving specific steps, formulations, etc. in producing the SOPs. This is not to say that Defendants will not have meritorious arguments on some or all of the SOPs – if, *e.g.*, they merely reflect information already known in the industry or were simply small "tweaks" of publicly available SOPs and were thus effectively generally known. But at this juncture in the proceedings, AllCells has met at least the lesser standard of serious questions going to the merits.

As for information about AllCells's internal operations, AllCells's motion focuses on Defendants' copying of a slide deck titled "2013 AllCells Q3 Business Meeting." *See* Lui Decl., Ex. U (email with attachment). Here as well, AllCells has satisfied the standard of serious questions going to the merits. The Court cannot say that the slide deck simply contains general knowledge about how to improve workflow.

Finally, for customer identities and customer-related information, AllCells has shown at least serious questions going to the merits on the latter. Defendants argue with some force that customer identities by themselves are not trade secrets in this instance. AllCells's customers largely seem to be big, well-known companies – obvious potential customers. *See Les Fields/C.C.H.I. Ins. Servs. v. Hines*, No. 15-cv-03728-MEJ, 2016 U.S. Dist. LEXIS 162163, at *46 (N.D. Cal. Nov. 22, 2016) (stating that "'[c]ourts are reluctant to protect customer lists to the extent they embody information [that is] "readily ascertainable" through public sources, such as business directories[, but] where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market[;] [s]uch lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers'"). However, there is a stronger argument that the customer-related information (in particular, information about customer needs/preferences, key contacts within a customer-company, pricing, and sales forecasts/projections) is a trade secret. AllCells has raised a serious question that, *e.g.*, the compilation of information about customer needs/preferences is a trade

6

secret, as is information about sales forecasts/projections. *See Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) ("[T]he evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort on the part of Courtesy. Moreover, the nature and character of the subject customer information, *i.e.*, billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors."). *See generally Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) (stating that, "[a]s a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret"). As for pricing, while AllCells may make some pricing information public, it also appears that, at least in some instances, pricing is tailored to a specific customer taking into account various nonpublic factors.

C.  Irreparable Injury/Balance of Hardships

"An irreparable injury is one which cannot be redressed by a legal remedy such as monetary damages." *Corp. Express Document & Print Mgmt. v. Coons*, No. CV 00-2426 AHM (Mex), 2000 U.S. Dist. LEXIS 22243, at *32 (C.D. Cal. Apr. 21, 2000). Here, there is an argument that AllCells's injuries could be compensated by money damages, ████████ ████████████████████████ Nevertheless, AllCells's concern that, without limitations, Cepheus could make unfair inroads into the industry and inflict long-term damage is not without any basis.

Moreover, the balance of hardships tips sharply in AllCells's favor. If a substantial volume of trade secrets were taken from AllCells and used unfairly by Defendants to directly compete with AllCells, AllCells would suffer significant hardship. On the other hand, Defendants will suffer little hardship from a narrowly drawn injunction. For example, Defendants have represented that they have given all of the copied SOPs to their counsel. Defendants have further represented that "[t]here are only three 'protocols' that Cepheus could use," all of which are "well-known"; the protocols are "simply directions written by a supplier on how to use its product." Lee Decl. ¶ 10. If that is the case, then Defendants cannot claim any harm if they were enjoined from using AllCells's SOPs.

7

Similarly, Defendants cannot claim harm if they are enjoined from using the slide deck identified above. As above, they have returned that information to AllCells. Moreover, Defendants have disavowed that the slide deck has any value to Cepheus given the different statuses of the companies.

Finally, Defendants have failed to show that any hardship to them from an injunction barring use of the customer-related information outweighs any hardship to AllCells without an injunction – that is, so long as Defendants are not barred from soliciting AllCells's customers (as requested by AllCells). To the extent AllCells claims undue hardship without an anti-solicitation injunction, the Court is not persuaded. Here, the balance of hardships weighs in Defendants' favor as such an injunction would effectively put Cepheus out of business.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that a limited preliminary injunction in favor of AllCells is appropriate. More specifically, Defendants, their agents, and others acting in concert with them are hereby enjoined from disclosing or using the following: (1) AllCells's SOPs; (2) AllCells's slide deck "2013 AllCells Q3 Business Meeting"; and (3) AllCells's information about customer needs/preferences, key contacts within a customer-company, pricing, and sales forecasts/projections. However, the limited scope of this injunction will not affect the availability of damages should AllCells later prove not only that its SOPs were protected trade secrets but also that Defendants used or disclosed not only the SOPs but derivative information therefrom found protectable under law.

This injunction does not bar Defendants from using publicly available SOPs (*e.g.*, from Alta Bates) or from using their "general knowledge and experience acquired in . . . former employment." *Morlife*, 56 Cal. App. 4th at 1525.

///
///
///
///
///

1   Finally, the Court orders AllCells to post a bond in the amount of █████████

2   ████████████████████████████████

3   This order disposes of Docket Nos. 11 and 65.

4

5   **IT IS SO ORDERED**.

6

7   Dated: March 28, 2017

8   _____
    EDWARD M. CHEN
9   United States District Judge